IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2024

IN RE NEVEAH W.

Appeal from the Juvenile Court for Davidson County
No. PT 257556     Sheila D. J. Calloway,  Judge

_____

No. M2023-00944-COA-R3-PT

_____

In this case involving termination of the mother's parental rights to her child, the trial court found that eight statutory grounds for termination had been proven by clear and convincing evidence.  The trial court further found that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest.  The mother has appealed.[1]  Having determined that the petitioner did not prove the statutory ground of abandonment through failure to visit the child prior to the mother's incarceration by clear and convincing evidence, we reverse the trial court's finding as to that ground.  Additionally, because the trial court made insufficient findings of fact and conclusions of law concerning a separate statutory ground it termed, "abandonment by an incarcerated parent/wanton disregard," we reverse the trial court's determination as to that ground as well.  We affirm the trial court's judgment in all other respects, including the termination of the mother's parental rights to the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Brittnie W.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] The trial court terminated the father's parental rights to the child in the same proceeding.  Inasmuch as the father has not appealed the termination of his parental rights, we will confine our analysis to those facts relevant to the mother's appeal.

# OPINION

## I. Factual and Procedural Background

This case focuses on Neveah W., the minor child ("the Child") of Brittnie W. ("Mother") and Christopher H. ("Father"). The Child was three years of age when the Tennessee Department of Children's Services ("DCS") filed an emergency petition in the Davidson County Juvenile Court ("trial court") on September 29, 2017, seeking to have the Child adjudicated dependent and neglected as to both parents. DCS filed the petition after receiving a referral on September 12, 2017. The facts as recited in the referral and incorporated into the petition stated:

> [The Child] (age 3) resides with her parents [Mother] and [Father] in Davidson County, TN. The family is homeless; they were staying in a hotel but checked out. Today officers were called out to . . . Doak Avenue in Nashville TN where a child was seen running out in the middle of the road while an adult ([Mother]) was seen asleep in the truck. By the time officers arrived to the scene the child was back inside the truck and was eating make-up. [Mother] was observed passed out in the driver's seat. [Mother] was under the influence and there was a baggie observed in her lap with a white residue inside. There was also a white residue observed on her pants. It took a while to wake [Mother] and when she did finally wake up she admitted that the white residue in the baggie was crushed up [l]oratab pills. [Mother] admitted that she had been snorting the loratab and there was a straw also found in the truck that she used to snort loratab. It is believed that [Mother] does not have a prescription as there was no prescription bottle found. There was also a piece of cellophane with three round orange pills that displayed 029. It was found that these pills are Alprazolam and is an anxiety medication. [Mother] states that she takes this for her nerves however the pills were not in a prescription bottle. [The Child] was transported to Vanderbilt Children's Hospital to be examined because it is unknown if the child ingested anything other than the make-up. [Mother] is being arrested and charged with child neglect and possession of a controlled substance. It is believed that the hospital social worker is speaking with a DCS case worker at this time. It is unknown where [Father] is at this time.

According to the petition, DCS Child Protective Services Investigator Daniel Griffin was informed by Vanderbilt Children's Hospital that the Child's urine was positive for cocaine and opiates. Mother was arrested for child neglect and possession of

a controlled substance after police officers found Mother in the vehicle with the drugs.[2] Father reported to Mr. Griffin that he did not know how the drugs got into the Child's system. Neither parent had stable housing or could provide Mr. Griffin with a home address.

DCS Team Leader Larae Bodley had determined that the Child needed a safety placement while Mother and Father worked with DCS to address their issues. Regarding this decision, DCS averred in the dependency and neglect petition:

> [T]here are reasonable services available which can prevent or eliminate the necessity of the child's removal to state custody at the present time; and . . . there is a less drastic alternative to removal, which can reasonably protect the child's health.
>
> [DCS] further states that it is in the best interest of the child and the public that this proceeding be brought and that there are reasonable services available which can prevent or eliminate the necessity of the child's removal at the present time; and that there is a less drastic alternative to removal, which can reasonably protect the child's health and welfare.

The parents agreed to place the Child with a maternal great-grandmother ("Great-Grandmother"). Based on the agreement of Mother, Father, and Great-Grandmother, all parties entered into an Immediate Protection Agreement ("IPA"). Under the IPA, Mother and Father were entitled only to supervised contact with the Child and no overnight visitation.

Mother subsequently violated the IPA by ceasing contact with DCS, and on November 9, 2017, the trial court entered an emergency protective custody order transferring custody of the Child to DCS. Based on the sworn statements of DCS Case Manager Taneisha Maiten, the trial court found:

> [T]here is probable cause to believe that [the Child] is a dependent and neglected child within the meaning of the law, that the child is subjected to an immediate threat to the child's health and safety to the extent that delay for a hearing would be likely to result in severe or irreparable harm, and there is no less drastic alternative to removal available which could reasonably and adequately protect the child's health and safety pending a preliminary hearing; that it is contrary to the child's welfare at this time to remain in the care, custody, or control of the parent/caretakers/custodians.

---

[2] During the termination trial, Mother testified that she had pled guilty to the charge of child neglect but did not testify as to when.

* * *

> The Court further finds that it is contrary to the child's welfare to remain in the care, custody, or control of [her] parents/caretakers/custodians, due to the above-stated facts. There are no less drastic alternatives to removal and, all reasonable efforts have been made and services have been rendered to prevent or eliminate the removal of said child from her home, including [IPA Placement].

Upon ordering the Child into DCS custody, the trial court appointed Dana Trella Cary as the guardian *ad litem* ("GAL") to represent the Child's best interest and requested a court-appointed special advocate ("CASA") volunteer.

On November 30, 2017, DCS developed a family permanency plan, which was presented as an exhibit at trial. According to the trial court's final order, the court ratified the first permanency plan on December 19, 2017, and found the plan to be reasonable, necessary, and in the best interest of the Child.[3] Under the plan, Mother was required to meet the following requirements: (1) undergo a parenting assessment and follow all recommendations, (2) undergo an alcohol and drug ("A&D") assessment and follow all recommendations, (3) submit to random drug screens, (4) present herself to DCS, (5) maintain contact and notify DCS of any contact information changes, (6) obtain and maintain stable housing and a legal source of income with documentation to DCS, (7) visit the Child a minimum of four hours per month, and (8) complete a mental health assessment and follow all recommendations.

The permanency plan was revised on November 8, 2018, adding the following requirements for Mother: (9) sign a release of information for DCS to receive access to a mental health assessment that Mother claimed she had undergone, (10) complete an updated mental health assessment if the first was not current, (11) maintain a bonded relationship with the Child, and (12) help Father establish paternity of the Child. The permanency plan was revised again during a child and family team meeting conducted by DCS on December 16, 2019, adding the following requirements for Mother: (13) continue to drug test regularly and provide clean urine specimens, (14) continue to refrain from drug use, and (15) complete a follow-up A&D assessment. In the December 16, 2019 plan, DCS also noted that "DCS will assist [Mother] with locating housing once she makes herself available to [DCS]." According to DCS records, Mother did not participate in the development of the initial permanency plan or the December 18, 2019 revision, but she did participate in the development of the November 8, 2018 revision.

---

[3] The ratification order itself is not in the appellate record.

The trial court conducted an adjudicatory hearing over the course of two days on July 17, 2018, and October 18, 2018. Although the court apparently ruled from the bench on October 18, 2018, the court did not enter an order adjudicating the Child dependent and neglected until May 14, 2020.[4] Incorporating the facts from the dependency and neglect petition, including the original referral for the September 2017 incident leading to the Child's removal from Mother's care, the trial court found that Mother had not disputed the facts on which the petition was based. The trial court found that the Child was dependent and neglected as to both parents pursuant to Tennessee Code Annotated § 37-1-102(b)(13)(G). The court further found that Mother had severely abused the Child, pursuant to Tennessee Code Annotated § 37-1-102(b)(27), due to Mother's failure to provide appropriate supervision with illegal substances in the car, resulting in the Child's ingestion of illegal substances.

In February 2020, Mother was incarcerated in Sumner County on a charge of violating her probation. During the termination trial, Mother testified that this period of incarceration lasted three months: "March, April, May . . ." of 2020. Mother acknowledged that "[a]s soon as [she] got released," she "caught" new charges. She was arrested on June 2, 2020, on charges of vehicular homicide, driving under the influence, and possession of drug paraphernalia. Mother was subsequently convicted of vehicular homicide and sentenced to eight years of imprisonment.

DCS filed its petition to terminate the parental rights of Mother and Father to the Child on June 5, 2020. DCS alleged statutory grounds against both Mother and Father of (1) abandonment by failure to visit the Child in the four months preceding the filing of the petition, (2) abandonment by failure to financially support the Child in the four months preceding the filing of the petition, (3) "abandonment by incarcerated parent," (4) substantial non-compliance with the reasonable requirements of the permanency plans, and (5) failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Child. As to abandonment by Mother as an incarcerated parent, DCS alleged that as an alternative to failure to visit and support in the four months preceding the petition's filing, Mother had failed to visit and support the Child in the four months preceding Mother's incarceration and also alleged that prior to her incarceration, Mother had exhibited wanton disregard for the Child's welfare. The petition alleged additional statutory grounds against Mother of (6) abandonment by failure to establish a suitable home for the Child, (7) severe child abuse, and (8) persistence of the conditions leading to removal of the Child.

---

[4] In DCS's termination petition and in the trial court's termination order, the date of the dependency and neglect adjudication is given as the last day of the hearing on October 18, 2018. However, the adjudicatory order is date stamped May 14, 2020, and DCS acknowledges on appeal that it was not entered until May 14, 2020.

The trial court conducted a bench trial over the course of three days on September 2, 2022; November 10, 2022; and March 13, 2023. Father's counsel appeared at the beginning of trial and requested to withdraw from his representation because he had been unable to contact Father. The trial court allowed Father's counsel to withdraw, and the proceedings continued without Father or his counsel present. Mother was incarcerated at the time of trial and participated via telephone. The limitation on Mother's ability to stay for an extended period of time on the prison telephone system was a factor in the span of time needed to complete the trial. DCS called Mother as an adverse witness and also presented testimony from Belinda Pelicci, who testified that she had been the DCS family services worker assigned to the case, through Youth Villages, since February 2022. DCS presented as exhibits, *inter alia*, the dependency and neglect records and the permanency plan records. Mother presented certificates she had earned while incarcerated, indicating her completion of a 150-hour "Cognitive Intervention Program," a life skills course, and a twelve-step course.

Undisputed testimony demonstrated that by the time of trial, the Child had been in approximately twelve placements while in protective custody. After leaving Great-Grandmother's custody, the Child resided with Father's aunt for a few months. At one point, the Child had been in a pre-adoptive home, but that placement had been disrupted due to the Child's behavioral and mental health issues. Mother had been afforded supervised visitation with the Child while the Child was in foster care in 2018. During the termination trial, Ms. Pelicci testified that Mother's last visit with the Child occurred on December 12, 2018, and that the visit had been cut short because the foster parents believed that Mother was under the influence of alcohol. According to Ms. Pelicci, DCS subsequently determined that Mother's visits with the Child should be suspended upon the recommendations of mental health professionals who were treating the Child.[5]

At the beginning of trial, the Child was receiving residential treatment at the Youth Villages Inner Harbour campus in Georgia and had been living at the facility since November 2021. By the last day of trial in March 2023, DCS had successfully placed the Child in a potential pre-adoptive foster home. Ms. Pelicci testified that placing the Child in her current foster home had involved many meetings between the Child and the foster parents. Ms. Pelicci acknowledged that the Child had only been residing in the foster home for a few days.

The trial court entered a final order on May 30, 2023, terminating Mother's and Father's parental rights to the Child. As to Mother, the court determined by clear and

---

[5] The GAL indicated during trial that the trial court magistrate had entered an order suspending Mother's visitation rights. However, this order is not included in the appellate record, and the trial court did not mention it in the final order.

convincing evidence that DCS had proven all of the statutory grounds alleged. The court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Mother timely appealed.

## II. Issues Presented

Mother presents eight issues on appeal, which we have restated as follows:

1.      Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child by failing to visit or financially support her.

2.      Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to Mother's incarceration.

3.      Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child by failing to provide a suitable home.

4.      Whether the trial court erred in finding by clear and convincing evidence that Mother had failed to substantially comply with the reasonable responsibilities of the permanency plans.

5.      Whether the trial court erred in finding by clear and convincing evidence that the conditions leading to the Child's removal from Mother's custody persisted.

6.      Whether the trial court erred in finding by clear and convincing evidence that Mother had committed severe child abuse against the Child.

7.      Whether the trial court erred in finding by clear and convincing evidence that Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child.

8.      Whether the trial court erred in finding by clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

"Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (West March 6, 2020, to current) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .

* * *

(c)     Termination of parental or guardianship rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of eight statutory grounds to terminate Mother's parental rights: (1) abandonment by failure to visit the Child, (2) abandonment by failure to financially support the Child, (3) abandonment by failure to establish a suitable home, (4) "abandonment by incarcerated parent/wanton disregard," (5) substantial non-compliance with the permanency plans; (6) persistence of the conditions leading to the Child's removal from Mother's custody, (7) severe child abuse, and (8) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. We will address each statutory ground in turn.

### A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to a parent's failure to visit or support a child, the version of Tennessee Code Annotated § 36-1-102(1)(A)(i) (West March 6, 2020, to June 30, 2021) in effect at the time of the instant petition's filing defined abandonment in pertinent part as:[6]

---

[6] Effective July 1, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-102(1)(A)(i) to make the applicable time period three consecutive months when the child is under four years of age. *See* 2023 Tenn. Pub. Acts, Ch. 373 § 1 (H.B. 163).

For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

In this case, DCS filed the termination petition on June 5, 2020. The trial court found that the relevant period pursuant to the statute was March 5, 2020, to June 5, 2020, and further found that Mother had failed to visit and support the Child during that time period pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i). We note that the four-month period preceding the petition's filing actually began on February 5, 2020, and ended on June 4, 2020. *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016). However, the trial court also found that "Mother was in the Sumner County Jail on February 28, 2020" and that at the time of trial, Mother was "still incarcerated on a Vehicular Homicide charge." DCS pled in its termination petition that if the proof demonstrated that Mother was incarcerated for any part of the four months preceding the petition's filing, the applicable time period for failure to visit and support would be the four months preceding Mother's incarceration.

On appeal, Mother presents arguments regarding the grounds of failure to visit and failure to support under Tennessee Code Annotated § 36-1-102(1)(A)(i). However, DCS presents arguments regarding failure to visit and support under Tennessee Code Annotated § 36-1-102(1)(A)(iv), which we determine is the applicable statutory subdivision due to the fact that Mother was incarcerated for a portion of the four-month period preceding the petition's filing. We further determine that the grounds of abandonment by failure to visit and by failure to support under § 36-1-102(1)(A)(iv) were properly pled by DCS. *See, e.g.*, *In re Paisley J.*, No. W2022-01059-COA-R3-PT, 2023 WL 4417390, at *9 (Tenn. Ct. App. July 10, 2023) (reversing the trial court's findings of abandonment by failure to visit and support under § 36-1-102(1)(A)(i) because the applicable grounds under § 36-1-102(1)(A)(iv) were not pled and were not tried by implied consent).

The version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) (West March 6, 2020, to June 30, 2021) in effect when the termination petition was filed provided in relevant part:[7]

---

[7] Effective July 1, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-102(1)(A)(iv) to make the applicable time period three consecutive months or an aggregation of the first ninety days when the child is under four years of age. *See* 2023 Tenn. Pub. Acts, Ch. 373 § 5-6 (H.B. 163).

(iv)    A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

        (a)    Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

        (b)    Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

        (c)    Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

(Emphasis added.)

The trial court found that Mother was incarcerated on February 28, 2020. This date appears to have stemmed from DCS's factual averments in the termination petition and from an exhibit presented through Ms. Pelicci's testimony, indicating that a previous DCS caseworker had met with Mother at the Sumner County Jail on February 28, 2020, and had explained to Mother the criteria and procedures for termination of parental rights at that time. DCS states in its appellate brief that Mother was incarcerated for three months "[b]eginning on an unspecified date in March 2020." Mother does not address her exact dates of incarceration in her appellate brief. At trial, Mother testified that she was incarcerated for three months in 2020 on a conviction for violation of probation and that "[a]s soon as [she] got released" after completing the probation violation sentence, she "caught" the new charges resulting in her vehicular homicide conviction. It is undisputed that Mother was arrested on the vehicular homicide and related charges on June 2, 2020.

Thus, the trial court's finding that Mother was incarcerated as early as February 28, 2020, is corroborated approximately by Mother's testimony. It is unclear whether

- 12 -

Mother may have been released for at least a full day prior to her June 2, 2020 arrest, but Mother did describe the arrest as occurring "[a]s soon as" she was released. Therefore, we determine that the applicable statutory period should have been computed as the four months immediately preceding Mother's incarceration in February 2020 pursuant to § 36-1-102(1)(A)(iv)(a). The last day for which there is no indication in the record that Mother was incarcerated was February 27, 2020. Accordingly, we conclude that the statutory determinative period for failure to visit and support ("Determinative Period") began on October 28, 2019, and ended on February 27, 2020. *See, e.g.*, *In re Addisyn P.*, No. M2021-00871-COA-R3-PT, 2022 WL 2167174, at *8 (Tenn. Ct. App. June 16, 2022) (concluding that the relevant determinative period ended on "the day before [the parent] was incarcerated) (citing *In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016)).

This Court has previously determined that a trial court's "miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period," *see In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019), and when the court's "findings of fact and conclusions of law include sufficient information to consider the correct four-month period," *see In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020). Here, the trial court made findings in its final order concerning whether Mother had visited the Child or made payments toward support of the Child during all of 2019 and 2020, inclusive of the applicable Determinative Period preceding her incarceration. Additionally, in a section of its final order entitled, "Abandonment by Incarcerated Parent/Wanton Disregard," the trial court found that Mother had failed to visit or support the Child pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv), albeit misidentifying the applicable period therein as during Mother's incarceration. Upon careful review, we conclude that the trial court's misidentification of the Determinative Period constituted harmless error. Accordingly, we will proceed with review of the abandonment grounds of failure to visit and failure to support during the proper Determinative Period of four months preceding Mother's incarceration.

We note that Mother somewhat conflates the issues on appeal regarding abandonment through failure to visit and abandonment through failure to support. She concludes her argument by stating that the termination of her parental rights "based on abandonment should be reversed." However, abandonment through failure to visit and abandonment through failure to support each constitutes a separate statutory ground for termination of parental rights. *See, e.g.*, *In re Adoption of Angela E.*, 402 S.W.3d 636, 641-42 (Tenn. 2013) (determining that the record did not support the ground of abandonment based on failure to support but did support the ground of abandonment based on failure to visit).

Regarding willfulness for both failure to visit and failure to support, the statutory abandonment definition provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I) (West March 6, 2020, to current). *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019) ("Under Tenn. Code Ann. § 36-1-102(1)[(I)], willfulness is an affirmative defense; thus, the burden is upon [the parent] to establish that his [or her] failure to [visit or support] was not willful.").

### 1. Failure to Visit the Child

The trial court found that Mother had not visited the Child since December 12, 2018, and that at this last visit, "the foster parents cut the visit short due to a belief that Mother was under the influence of alcohol at the time." The court further found: "[T]he DCS team determined Mother's visits should be suspended. Mother never attempted to reinstate the visits until she was incarcerated." The court thereby determined that Mother had failed to visit the Child during the Determinative Period prior to Mother's incarceration. However, Ms. Pelicci acknowledged in her testimony that even if Mother had been available for visitation with the Child, DCS would not have provided visitation based on the Child's mental health status.

Mother did not file a responsive pleading raising the affirmative defense of lack of willfulness. However, during trial, DCS's counsel maintained during closing argument that Mother's failure to visit had been willful. Mother's counsel then argued that Mother's failure to visit had not been willful because DCS had determined that it would not be appropriate for Mother to have visitation with the Child due to the Child's mental health status. On appeal, DCS does not argue that Mother waived the affirmative defense by waiting to raise it until closing argument. Instead, DCS states that it "does not dispute Mother's argument on appeal and therefore does not defend the trial court's termination of Mother's rights on the ground of abandonment by failure to visit."

Upon review of the record as a whole and the parties' arguments, we find that the affirmative defense of Mother's lack of willfulness in failing to visit the Child was tried by implied consent. *See* Tenn. R. Civ. P. 15.02; *Hiller v. Hailey*, 915 S.W.2d 800, 804 (Tenn. Ct. App. 1995) ("Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby." (quoting *Zack Cheek Builders v. McLeod*, 597 S.W.2d 888, 890-91 (Tenn. 1980))). Furthermore, we agree with the parties on appeal and determine that the evidence presented at trial did not support a finding by clear and convincing evidence that Mother's failure to visit the Child during the Determinative Period was willful. We reverse the trial court's finding on this statutory ground.

### 2. Failure to Financially Support the Child

The trial court also found that DCS had proven the statutory ground of Mother's abandonment through failure to financially support the Child by clear and convincing evidence. The Determinative Period set forth above for the ground of failure to visit, October 28, 2019, through February 27, 2020, applies to this ground as well. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).

In its final order, the trial court stated in relevant part:

> Mother was ordered to pay support on behalf of the child in the amount of $194.33/month beginning April 1, 2019. She has not contributed to the support of the child since she has been in DCS custody. Although Mother testified that she made a payment through her taxes, there was no proof presented showing any consistent payments.
>
> * * *
>
> As previously stated, both Mother and Father failed to visit or provide support of any kind for the child during the statutory time period. Therefore, there are grounds to terminate the parents' rights based on their abandonment of the child by . . . failing to support the child.

Upon careful review, we determine that the record supports the trial court's findings as to this statutory ground.

The version of Tennessee Code Annotated § 36-1-102(1)(D) (West March 6, 2020, to June 30, 2021) in effect when the instant petition was filed defined "failed to support" or "failed to make reasonable payments toward such child's support" as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child" and provided that the parent's ability to make only small payments was not a defense "if no payments were made during the relevant four-month period."[8] Token support "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) (West March 6, 2020, to current).

On appeal, Mother avers that she "testified that she provided financially for her child including her tax refund and stimulus check." She asserts that "[s]he provided birthday and Christmas gifts for [the Child] before she was incarcerated." Ms. Pelicci testified that DCS was unable to locate proof that Mother paid child support with tax refunds or stimulus checks, and Mother presented no evidence of payment at trial. Mother testified that "they took" her stimulus check for child support. However, this Court has made it clear that such intercepted payments do not constitute a voluntary payment of child support. *See In re Ima D*., No. M2021-00022-COA-R3-PT, 2021 WL 5441832, at *5 (Tenn. Ct. App. Nov. 22, 2021); *In re Bryce F*., No. E2014-01380-COA-R3-PT, 2014 WL 7403826, at *13 (Tenn. Ct. App. Dec. 30, 2014); *In re Kadean T*., No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at *6 (Tenn. Ct. App. Oct. 31, 2014)). Consequently, such payment should "not be considered in determining whether Mother failed to support her child during the relevant period." *See Kadean T*., 2014 WL 5511984, at *7. It is unclear whether Mother's claimed child support payment made from her tax refund was voluntary. Regardless, Ms. Pelicci testified that DCS could locate no record of any child support payments made by Mother, and Mother failed to provide any documentary proof to refute that testimony.

Mother argues that DCS failed to establish willfulness as to this ground because DCS did not provide sufficient proof of the income Mother might have earned or her expenses during the Determinative Period. DCS responds that it was Mother's burden to prove that her failure to support the Child was not willful, and we agree. *See In re Nicholas C*., 2019 WL 3074070, at *13 ("Under Tenn. Code Ann. § 36-1-102(1)[(I)], willfulness is an affirmative defense; thus, the burden is upon [the parent] to establish that his [or her] failure to [visit or support] was not willful."). Specific to the statutory ground of failure to support the Child, the record does not reflect that Mother raised lack of willfulness as an affirmative defense at any point during trial, and her appellate

_____

[8] Effective July 1, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-102(1)(D) to substitute the phrase, "for the applicable time period," in place of the phrase, "for a period of four (4) consecutive months," and to substitute "time" in place of "four-month." *See* 2023 Tenn. Pub. Acts, Ch. 373 § 3 (H.B. 163).

argument erroneously suggests that DCS has the burden to prove a lack of willfulness. Accordingly, we determine that Mother has waived the affirmative defense of lack of willfulness concerning this statutory ground. *See Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 233 (Tenn. Ct. App. 2019) ("Failure to ple[a]d an affirmative defense generally results in a waiver of the defense." (quoting *ADT Sec. Servs., Inc. v. Johnson*, 329 S.W.3d 769, 778 (Tenn. Ct. App. 2009)).

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother abandoned the Child by failing to financially support her during the Determinative Period.

### 3.  Wanton Disregard Prior to Incarceration

Mother challenges whether the trial court erred in terminating her parental rights based on a finding that she had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to incarceration. Mother specifically contends that the trial court made insufficient findings of fact in relation to this issue. DCS asserts that Mother's actions prior to her incarceration constituted wanton disregard. However, DCS does not address the sufficiency of the trial court's order concerning this ground. Upon thorough review, we cannot discern from the trial court's order that it made a finding of wanton disregard.

Regarding this statutory ground, the version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) in effect when the termination petition was filed defined abandonment by an incarcerated parent in relevant part:

> (iv)    A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> * * *
>
> (c)    engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

(Emphasis added.)

In the conclusion of its final order, the trial court found that Mother had "abandoned the child by [her] incarceration four (4) months prior to the filing of this petition" without mentioning wanton disregard. As noted in a previous section of this Opinion, the trial court made its detailed findings regarding failure to visit and support under a time period inapplicable to an incarcerated parent. The court then included findings under the following heading:

> ABANDONMENT BY INCARCERATED PARENT/WANTON DISREGARD T.C.A. § 36-1-113(g)(1), § 36-1-102(1)(A)(iv), § 36-1-102(1)(B), § 36-1-102(1)(C), § 36-1-102(1)(D), and § 36-1-102(1)(E).

After citing the definition of abandonment under § 36-1-102(1)(A)(iv) and explaining when each parent had been incarcerated, the court stated the following:

> Both parents have been incarcerated throughout the time the child has been in the custody of DCS. Furthermore, neither parent has visited, supported or made any financial payments for the support of the child. Therefore, there are grounds to terminate the parents' rights based on their abandonment of the child by their incarceration.

Apart from the heading and the citation to the statute, the court did not mention "wanton disregard" in its findings or conclusions of law.

The trial court appears to have conflated into one single ground the three statutory grounds possible under the abandonment definition applicable to an incarcerated parent. As noted above, we have addressed the trial court's findings regarding the grounds of failure to visit and failure to support. Here, to the extent that the trial court may have intended to find that Mother exhibited wanton disregard for the Child prior to her incarceration, we must conclude that the court did not include sufficient findings of fact and conclusions of law concerning this ground. *See* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."). Moreover, we cannot discern from the trial court's judgment whether it terminated Mother's parental rights based on Mother's wanton disregard for the Child or whether its findings on this ground were merely additional findings concerning Mother's failure to visit and failure to support.

Therefore, because the trial court did not include specific findings of fact to support a legal conclusion that Mother exhibited wanton disregard for the Child prior to Mother's incarceration, we are compelled to reverse the court's judgment with respect to abandonment through wanton disregard. *See In re Mickeal Z.*, No. E2018-01069-COA-

- 18 -

R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (opting to reverse the judgment with respect to the deficient statutory ground as to one parent when this Court's ultimate disposition included the affirmance of the trial court's termination of that parent's rights); *see also In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *13 (Tenn. Ct. App. Nov. 10, 2022).

### 4. Failure to Establish a Suitable Home

The trial court found that Mother had abandoned the Child through failure to provide a suitable home. The version of Tennessee Code Annotated § 36-1-102(1)(A) (West March 6, 2020, to June 30, 2021) in effect when the termination petition was filed provided the following definition of abandonment related to this ground:[9]

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians

---

[9] Effective July 1, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-102(1)(A)(ii)(a) by deleting the language, "a petition has been filed in the juvenile court alleging that a child is" and substituting "a child is alleged to be." *See* 2023 Tenn. Pub. Acts, Ch. 253 § 7 (S.B. 264).

have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Concerning this statutory ground, the trial court specifically found:

In this case, the court adjudicated the child dependent, neglected, and [severely] abused and placed her in DCS custody. The child was removed from the custody of Mother on November 8, 2017. During the relevant period of November 8, 2017 to March 8, 201[8], DCS made reasonable efforts to assist Mother to provide a suitable home for the child by creating a permanency plan to determine the tasks needed for Mother to regain custody.

Although Mother has had several DCS caseworkers during the pendency of the case, she was still unable to establish a suitable home for the child. She continued to have unstable housing, sometimes being homeless or living in unsafe situations. Mother also had criminal charges and periods of incarceration after the child was removed from her custody. Therefore, there are grounds to terminate Mother's rights based on her abandonment of the child by failing to establish a suitable home for the child.

Upon our review of the record, we conclude that the evidence does not preponderate against the trial court's findings and agree that DCS presented clear and convincing evidence to establish this statutory ground of abandonment.

On September 29, 2017, DCS filed its petition alleging that the Child was dependent and neglected due to the September 12, 2017 incident in which Mother was charged with child neglect and possession of a controlled substance, followed by Mother's violation of the IPA when she ceased contact with DCS. On November 9, 2017, the trial court entered its emergency protective order, noting that the Child had been removed from Mother's custody the day before and finding probable cause that the Child was dependent and neglected as to Mother. In the protective order, the trial court found that Mother did not have stable housing and could not provide an address to DCS,

that reasonable efforts had been made to prevent the Child's removal, and that the Child entered DCS custody when continued efforts to locate Mother were unsuccessful. The order also stated that Mother did not dispute the trial court findings.

As the case progressed, Mother never established stable housing following the Child's removal and at the time of trial, had been incarcerated since February 28, 2020. *See In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) ("[T]he proof necessary to support termination under this ground need not be limited to any particular four-month period after removal."). The trial court found that "Mother [had] not been able to show if her addiction [was] under control when in society rather than a state prison" and that Mother was unable to make an adjustment to the situation before she became incarcerated. The evidence preponderates in favor of these findings.

Concerning what a suitable home entails and the relationship between a parent's efforts to establish a suitable home and DCS's reasonable efforts to assist the parent, this Court has elucidated:

> Here, we "consider[ ] whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home entails "[a]ppropriate care and attention" for the child, *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home is "free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014). DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting with establishment of a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn.

- 21 -

Ct. App. 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015); *see also In re Matthew T.*, 2016 WL 1621076, at *7. Sole responsibility does not lie with DCS, and "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child." *In re Hannah H.*, 2014 WL 2587397, at *9.

*In re C.N.*, No. M2020-01021-COA-R3-PT, 2022 WL 94403, at *12 (Tenn. Ct. App. Jan. 10, 2022).

On appeal, Mother argues that DCS did not provide specific proof that it made reasonable efforts to assist her in establishing a suitable home. We determine this argument to be unavailing. Throughout the Child's time in protective custody, the trial court repeatedly found that DCS had made reasonable efforts to assist Mother in establishing a suitable home in light of Mother's inconsistent contact. DCS had encountered difficulty maintaining contact with Mother since the Child was first removed from her custody more than six years prior to trial. In the permanency plans, DCS staff noted that they would be able to assist Mother in looking for housing once she made herself available to DCS. Tennessee Code Annotated § 36-1-102(1)(A)(ii)(c) makes it clear that "[t]he efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable <u>if such efforts equal or exceed the efforts of the parent or guardian</u> toward the same goal[.]" (Emphasis added.) Again, Mother never obtained stable housing prior to incarceration and, as the trial court found, her "communication with DCS was troublesome throughout this case."

We determine that the record supports the trial court's findings regarding DCS's reasonable efforts and Mother's failure to establish a suitable home. We therefore affirm the trial court's finding of clear and convincing evidence regarding this statutory ground of abandonment.

### B. Substantial Noncompliance with Permanency Plans

The trial court found by clear and convincing evidence that Mother had failed to substantially comply with the statement of responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) (West March 6, 2020, to current) provides as an additional ground for termination of parental rights:

(2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

- 22 -

In its final judgment, the trial court reviewed Mother's failure to substantially comply with the requirements of the permanency plans and found:

> There was a permanency plan approved and entered during the years the child has been in DCS custody. The initial plan was entered on November 30, 2017 and both Mother and Father knew the requirements to be completed for reunification to occur. The Court ratified the initial permanency plan on December 19, 2017 and found it to be reasonable, necessary and in the best interest of the child. The permanency plan was revised on November 18, 2018 and December 16, 2019, but the requirements were the same in the plan.

> * * *

> Mother did not complete any of the tasks assigned to her while she was in the community. Mother has completed some task[s] while incarcerated and submitted certificates of completion. . . . Therefore, there are grounds to terminate the parents' rights based on their substantial non-compliance with the permanency plans.

On appeal, Mother posits that although incarceration has restricted her ability to comply with the permanency plans, "she has completed a substantial number of comparable tasks to those specifically listed on the plan" since her incarceration, including a cognitive intervention program, life skills course, twelve-step course, parenting class, and group therapy. However, the standard for substantial compliance is not whether any action at all has been taken by Mother. Rather, the standard is whether the reasons for the Child's removal have been remedied. *See, e.g.*, *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *12-13 (Tenn. Ct. App. Jan. 31, 2020) (explaining in response to the mother's argument that "the trial court failed to give proper credit to her for the requirements and responsibilities with which she did comply" that "[t]he problem with Mother's argument in this regard is that the overall goal of the reasonable responsibilities in Mother's permanency plans was to remedy the reasons for the Children's removal" (citing Tenn. Code Ann. §§ 36-1-113(g)(2), 37-2-403(a)(2)(C))).

Under the permanency plans, Mother was required to meet the following requirements: (1) undergo a parenting assessment and follow all recommendations, (2) undergo an A&D assessment and follow all recommendations, (3) submit to random drug screens, (4) present herself to DCS; (5) maintain contact and notify DCS of any contact information changes, (6) obtain and maintain stable housing and a legal source of income with documentation to DCS, (7) visit the Child a minimum of four hours per month, (8) complete a mental health assessment and follow all recommendations, (9) sign a release

of information for DCS to receive access to a mental health assessment that Mother claimed she had undergone, (10) complete an updated mental health assessment if the assessment if the first was not current, (11) maintain a bonded relationship with the Child, (12) help Father establish paternity of the Child, (13) continue to drug test regularly and provide clean urine specimens, (14) continue to refrain from drug use, and (15) complete a follow-up A&D assessment.

We recognize that Mother's incarceration impeded her ability to comply with the permanency plan requirements since February 2020. However, the first plan was developed in November 2017, and throughout the pendency of this case, Mother failed to complete the vast majority of the tasks required under the permanency plans. Mother's contact with DCS was problematic. She never obtained stable housing or a legal source of income, and she did not undergo a parenting assessment. Although Mother testified that she had undergone a mental health assessment, she did not provide DCS with any documentation of the assessment or undergo an updated one as required by the permanency plans. As to visiting the Child, although we have determined that the evidence of Mother's willfulness in failing to visit did not rise to the level of clear and convincing, the fact remains that she had not visited the Child since December 12, 2018, and had not taken any steps to reinstate the visits until her most recent incarceration. Mother did complete an A&D assessment and rehabilitation treatment in 2018, but she did not complete the required follow-up A&D assessment, and her June 2020 incarceration resulted from a vehicular homicide conviction for an incident that occurred while she was admittedly driving under the influence of alcohol.

Furthermore, nothing in the record supports Mother's claim that the services and programs she had completed while incarcerated were comparable to the tasks required by the permanency plans. We commend Mother for making efforts to improve her life during her incarceration. However, we determine that Mother's efforts after the termination petition's filing were "too little, too late" to demonstrate substantial compliance. *See, e.g.*, *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003) (affirming the trial court's finding that the parent's improvements made since the filing of the termination petition were "too little, too late") (internal quotation marks omitted).

We therefore conclude that the trial court did not err in terminating Mother's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the permanency plans.

### C. Persistence of Conditions Leading to the Child's Removal

The trial court determined that the statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody had been proven by

clear and convincing evidence. Relative to this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (West March 6, 2020, to current) provides:

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final judgment, the trial court summarized its findings regarding this statutory ground as to Mother as follows:

The child has been removed from Mother's custody for more than six (6) months. The conditions that led to the removal of the child from Mother were an inability to properly supervise the child, provide suitable housing and substance abuse issues. The conditions which led to the removal still exist, and there is little evidence that these conditions will be able to be remedied at an early date so the child can be returned. Mother is currently incarcerated and has the possibility of being incarcerated until 2024. Mother is not able to provide suitable housing for the child at this time. Even if she is released early, Mother does not have a plan for providing suitable housing. The continuation of the parent/child relationship greatly diminishes the child's chance of an early integration

- 25 -

into a stable and permanent home. Therefore, there are grounds to terminate Mother's rights based on the conditions which existed when the child was first removed from Mother's custody[.]

Upon thorough review, we determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground. By the time of trial, the Child had been in protective custody for five years, far exceeding the statutory six-month minimum. As established through the evidence respecting the statutory grounds of abandonment and substantial noncompliance with the permanency plans, the conditions that led to the Child's removal persisted. Mother had not demonstrated sobriety outside of incarceration since the Child's removal, and Mother never obtained stable housing prior to incarceration. As to her ability to supervise the Child, Mother never completed a parenting assessment and did not take any steps prior to her incarceration to reestablish visitation.

Concerning the focus of the statutory ground at issue, this Court has explained:

The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)]. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

Mother contends that the conditions that prevent the Child from returning to Mother's custody no longer exist or are likely to be remedied at an early date because she expects to be released on parole no later than July 2024 and meanwhile has consistently passed drug screens during her incarceration and participated in programs to address issues causing the Child's removal. As mentioned previously, we recognize that Mother

has made progress while incarcerated to address these issues. However, the strides she has made have occurred since the petition was filed, and her overall actions, including her return to substance abuse following a prior incarceration, have not demonstrated that she can maintain her sobriety in an uncontrolled environment. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *11 (Tenn. Ct. App. Aug. 15, 2023) ("Although Mother has made significant progress during her rehabilitation, as previously discussed, due to Mother's relapses, her sobriety has not been tested outside the controlled environment of her rehabilitation program such that we can say that it would be in the child's best interest to be returned to her custody"); *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *17 (Tenn. Ct. App. July 6, 2021) ("Mother should be commended for her recent efforts to refrain from further drug use and to establish residential stability. However, the majority of her efforts took place after DCS filed its termination petition.").

The evidence further supported a determination that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home, particularly considering Mother's lack of cooperation with DCS and the Child's limitations for placement options. We therefore conclude that the evidence does not preponderate against the trial court's findings and agree that clear and convincing evidence established this statutory ground for termination.

### D. Severe Child Abuse

The trial court also found clear and convincing evidence that Mother had severely abused the Child. Regarding this ground for termination of parental rights, Tennessee Code Annotated § 36-1-113(g)(4) (West March 6, 2020, to current) provides:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this action Tennessee Code Annotated § 37-1-102(b)(27)(E) (West July 1, 2019, to current) defines "severe child abuse" as:

> Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

As this Court has previously explained:

[A] parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)). "The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011) (quoting *State Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

Following a hearing upon DCS's dependency and neglect petition, the trial court entered an adjudicatory order on May 14, 2020, finding the Child to be dependent and neglected, pursuant to Tennessee Code Annotated § 37-l-102(b)(13)(G) (July 1, 2019, to current), and the victim of severe abuse perpetrated by Mother pursuant to Tennessee Code Annotated § 37-1-102(b)(27). In determining that this ground for termination of parental rights had been proven by clear and convincing evidence in its final order, the trial court found that the adjudicatory order had become final because it was not appealed.

Tennessee Code Annotated § 36-1-113(g)(4) allows a trial court to terminate a parent's rights on the ground of severe child abuse if the parent "has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court" (emphasis added). It is well settled that a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse at the trial to terminate parental rights. *See In re Samaria S.*, 347 S.W.3d at 201; *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). In the case at bar, the trial court properly found that the May 14, 2020 adjudicatory order was *res judicata* as to the issue of whether Mother committed severe child abuse because Mother never appealed the order. As this Court concluded in a comparable situation:

Because Mother did not appeal the trial court's finding of severe child abuse within the time allowed by law, the order became a final order and the finding of severe child abuse is *res judicata.* Thus, the trial court did not err in finding that Mother has committed severe abuse for purposes of terminating her parental rights.

- 28 -

*In re Serenity S.*, No. W2014-00080-COA-R3-PT, 2014 WL 6612571, at *6 (Tenn. Ct. App. Nov. 24, 2014).

Mother asserts that the trial court erred in relying upon the finding of severe child abuse contained in its adjudicatory order as a ground for termination of her parental rights. According to Mother, she was unaware of the court's finding of severe child abuse and subsequent entry of the order. We note, however, that the May 14, 2020 order contained a certificate stating that it was sent to Mother's counsel on the same day. Moreover, Mother's counsel stated during trial that although Mother had initially denied having knowledge that the order had been entered, "[o]bviously an order was submitted, so I'll leave it at that." As this Court has repeatedly articulated: "It is well settled that issues not raised at the trial level are considered waived on appeal." *See Duke v. Duke*, 563 S.W.3d 885, 898 n.2 (Tenn. Ct. App. 2018) (quoting *Moses v. Dirghangi*, 430 S.W.3d 371, 381 (Tenn. Ct. App. 2013)). We therefore deem Mother's issue regarding her knowledge of the adjudicatory order to be waived, and we affirm the trial court's determination that this statutory ground for termination was proven by clear and convincing evidence.

### E. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court further found clear and convincing evidence to support termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (West March 6, 2020, to current), which provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has explained the following with regard to this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

- 29 -

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

As to the first prong, our Supreme Court has instructed:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677. Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In the instant action, the trial court found regarding this statutory ground as to both Mother and Father:

Both parents have failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child and placing her in their legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Neither parent has completed all of the requirements needed to be done in order to reunify with their child. For multiple years now the parents have failed to make consistent visits or even contact with the child. The child has little to no knowledge about either of her parents according to the child's CASA advocate. Therefore, there are grounds to terminate the

parents' rights based on their failure to assume custody or financial responsibility.

Upon thorough review of the trial court's findings specific to Mother, we determine that clear and convincing evidence supported the trial court's conclusions as to this ground.

Regarding the first prong, Mother maintains that the trial court's findings "should be reversed" because she had "manifested a willingness for her Child to return to her custody." Mother's entire argument in support of her postulate, indeed in support of reversing this ground, consists of one sentence: "Mother testified that while she currently does not have the means to take custody of [the Child] due to her incarceration, she has a plan to provide for herself and the Child once she is released from incarceration." However, our review of the record indicates that Mother's testimony, coupled with the courses she completed while incarcerated, were her only demonstrations of a willingness to assume custody.

We note that the trial court's findings here are somewhat conclusory and would benefit from more factual detail. *See In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *10 (Tenn. Ct. App. Oct. 31, 2023) (vacating the trial court's findings terminating the mother's parental rights on this ground upon determining that the court's factual findings were conclusory as to the first prong of the mother's failure to manifest an ability and willingness to assume custody). However, coupling the trial court's factual findings under this ground regarding Mother's failure to complete "the requirements needed to be done in order to reunify with [her] child" and the court's findings in the order as a whole, the court did specifically find that Mother had not demonstrated the ability and willingness to establish a suitable home or steady income, provide for the Child financially through child support, maintain sobriety outside of a controlled environment, or reintegrate into the Child's life through compliance with the requirements of the permanency plans. The evidence presented at trial supports these findings. We agree with the trial court that DCS met its burden to establish this prong by clear and convincing evidence.

The second prong requires DCS to prove by clear and convincing evidence that placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the Child's physical and psychological welfare. Mother has not addressed this prong in her appellate argument. As DCS notes, this Court has enumerated various circumstances that support a finding of substantial harm:

> By way of illustration, forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable. Or placing a child with a parent who engaged in repeated criminal conduct that

required incarceration would put a child at risk of substantial physical or psychological harm. And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm.

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (internal citations omitted).

The trial court determined that all of these circumstances were present. Specifically, Ms. Pelicci testified that the Child had no demonstrated attachment to Mother, had used "mom" to refer to her former foster parent, and had not been visited by Mother since 2018. Furthermore, Mother was convicted of criminal charges throughout this case, including the initial criminal charges of child neglect and possession of a controlled substance, a subsequent criminal charge for violating her probation, and the most recent criminal charge of vehicular homicide. Finally, as the trial court found, Mother had not shown at the time of trial "if her addiction is under control when in society rather than a state prison." Mother completed one A&D assessment and rehabilitation treatment in 2018. Nonetheless, her substance abuse issues persisted, becoming a factor in the June 2020 accident that led to her vehicular homicide conviction.

The evidence also does not preponderate against the trial court's finding by clear and convincing evidence that placing the Child into Mother's custody would pose a risk of substantial harm to the Child's physical and psychological welfare. Accordingly, we affirm the trial court's determination regarding this statutory ground for termination of Mother's parental rights.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the

unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (West March 6, 2020, to April 21, 2021) in effect when the instant petition was filed listed the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

    Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the

analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

As a preliminary matter, we address the trial court's application of mixed versions of the statutory best interest factors applicable to this action. In the final order, the trial court stated that it had "considered the relevant and child-centered, non-exclusive factors found at T.C.A. § 36-1-113(i)." The court then made specific findings in relation to seven best interest factors, concluding that all relevant factors weighed in favor of terminating Mother's parental rights to the Child. Four of the factors considered by the trial court were taken from the nine factors provided in the version of the statute in effect at the time of the termination petition's filing in June 2020. Three of the factors were taken from the current version of the statute, which includes twenty best interest factors and became effective on April 22, 2021. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). Inasmuch as the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute, quoted above, are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

Although Mother argues that the trial court erred in finding that termination of her parental rights was in the Child's best interest, she has not set forth the best interest factors from either version of the statute in her appellate brief and has not addressed whether the trial court erred by choosing some factors from each set. DCS contends that any error in the trial court's choice of factors was harmless. As DCS notes, this Court has previously held that reversible error does not occur when a court applies the new factors despite the termination petition's having been filed prior to the amendment's effective date "because the old factors are essentially contained within the new factors." *See In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022) (citing *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022)).[10]

---

[10] By contrast, in cases wherein the new statutory factors applied but the trial court considered only the old factors, this Court has reversed the trial court's findings and remanded for the trial court to reconsider the best interest analysis based on the new factors. *See, e.g.*, *In re Alessa H.*, No. M2021-01403-COA-R3-PT, 2022 WL 3332653, at *14 (Tenn. Ct. App. Aug. 12, 2022) ("[T]the statute as amended adds a

In a recent case, this Court was faced with a similar situation wherein the trial court had "applied some amalgam of the old best interest factors and the new without considering the entirety of either set." *In re Cartier H.*, 2023 WL 7158076, at *12. As the *Cartier H.* Court explained:

> In some prior cases, we have held that it was not reversible error for the trial court to consider both some of the old and new factors in reaching its ultimate decision as to best interest. *See In re Mitchell B.*, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023); *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022). Rather, we held that if the trial court's ruling provides a detailed summary of the trial court's reasoning such that this Court can make a meaningful review of the trial court's findings, this practice is not error "so long as the factors considered are relevant to the facts presented in th[e] case." *In re Mitchell B.*, 2023 WL 3619561, at *6. In both cited cases, however, the trial courts entered detailed and thorough orders considering an abundance of best interest factors.

*Id.* at *13. In *Cartier H.*, this Court vacated the trial court's finding that termination of the mother's parental rights was in the children's best interest upon determining that the trial court had "failed to make specific findings as to a number of relevant factors" under the amended statute, which applied in that case. *Id.* at *14.

Upon careful review, we determine that despite the trial court's "conflat[ion] [of] the old and new factors," *see In re Mitchell B.*, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023), the trial court here considered relevant statutory factors in weighing the Child's best interest, and the court provided a thorough analysis. Under the circumstances of this case, and particularly considering the prior version of the statute in effect at the time of the termination petition's filing, we deem harmless the trial court's error in considering some old and some new statutory factors. We will therefore proceed with our review of the trial court's best interest analysis.

The trial court found factors one, four, five, and six from the applicable version of the statute to be relevant and weighed them in favor of terminating Mother's parental rights to the Child. Concerning factor one, whether Mother had made an adjustment of

---

number of 'additional factors that should be considered, if relevant.'" (quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022)).

circumstance, conduct, or conditions so as to make it in the Child's best interest to be in her home, the trial court found:

> Mother is incarcerated and will be until 2024 unless she is granted parole sooner. Mother has not been able to show if her addiction is under control when in society rather than a state prison. Mother was unable to make an adjustment to her circumstances before she was arrested on her current charges. . . . As of now, neither parent has a place that is suitable for the child.

DCS demonstrated that Mother had made no adjustment in her situation prior to her most recent incarceration, had failed to establish stable housing prior to her incarceration, and had never completed a parenting assessment. Although Mother had made progress in controlling her substance abuse and had completed a parenting class while incarcerated, as the trial court found, "Mother [had] not been able to show if her addiction [was] under control when in society rather than a state prison." The evidence preponderates in favor of the trial court's findings as to factor one.

As to factor four, whether a meaningful relationship had been established between Mother and the Child, the trial court found regarding both parents:

> The child has been in the custody of DCS since 2017 and has had little to no contact with either parent during these years. The Court finds that the child does not have a meaningful bond with either parent.

While acknowledging that her bond with Neveah "may have weakened over time," Mother asserts that prior to her February 2020 incarceration, she "had a strong bond" with the Child and "tried to visit her as much as possible when [the Child] was initially placed with her great grandmother prior to DCS custody." The Child was brought into DCS custody through entry of the trial court's emergency protective order on November 9, 2017, after Mother had violated the IPA she had entered into by ceasing contact with DCS. Subsequently, Mother enjoyed some supervised visitation with the Child in 2018. However, her last visit occurred in December 2018, after which DCS suspended visitation at the recommendation of mental health professionals who were treating the Child. By the time of trial, Mother had not visited with the Child for approximately four years. We agree with the trial court's finding that factor four weighs in favor of terminating Mother's parental rights.

Concerning factor five, the effect a change of caretakers and physical environment would have on the Child's emotional, psychological, and medical condition, the trial court concluded:

This factor weighs in favor of [DCS]. Although the child has emotional and behavioral issues that are connected to her movement and instability, she is currently in a potential pre-adoptive home. Once the child has stability, she tends to become comfortable. The child has a better chance of recruitment for a pre-adoptive home once the parent's rights have been terminated.

Mother contends that because the Child experienced twelve placements while in protective custody, including one year in a Youth Villages facility, the Child would be "better off," as Mother urged in her testimony, in her custody once she is released from prison. Although the Child was still residing in the Youth Villages facility at the beginning of trial in September 2022, Ms. Pelicci testified that the Child had bonded with counselors there and had made positive progress with her mental health and behavioral concerns. Ms. Pelicci further testified that by the conclusion of trial in March 2023, the Child had been placed in a new pre-adoptive foster home, and that although she had only been in the home for a few days, the placement preparation had involved several successful meetings between the foster parents and the Child. Certainly the number of placements the Child experienced is not ideal. However, by the time of trial, the Child had achieved some measure of stability in her physical, psychological, and mental condition that Mother simply could not provide. The evidence preponderates in favor of the trial court's findings as to this factor.

Factor six involves whether the parent (or a person living with the parent) has shown any type of abuse or neglect toward the Child. As noted previously, the Child was adjudicated dependent and neglected and severely abused by Mother in the order entered by the trial court in May 2020. We agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

As noted above, the trial court also considered three factors from the amended version of Tennessee Code Annotated § 36-1-113(i)(1), factors (A), (C), and (K), all of which are related to each other and also include elements of the prior factors. These factors provide for consideration of:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

* * *

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions[.]

Factor (A) emphasizes the Child's critical need for stability and continuity of placement. It is closely related to the old factor five, the effect a change of caretakers would have on the Child's condition, which is factor (B) under the amended statute. Regarding Factor A, the trial court found that the Child did "not have an attachment" to Mother, used "mom" to describe her former foster mother, and had not visited with Mother since December 2018. Considering our review of the trial court's findings in relation to factor (5), we agree that the Child's critical need for stability and continuity of placement favored terminating Mother's parental rights.

Factor (C) concerns the parent's demonstration of continuity and stability in meeting the Child's basic needs while factor (K) concerns the parent's utilization of offered services and assistance to make a lasting adjustment of circumstances. Factor (K) mirrors in part factor two from the previous version of the statute: whether the parent has failed to effect a lasting adjustment after reasonable efforts made by available social services such that lasting adjustment does not appear possible. Taken together, under factors (C) and (K), the trial court found that (1) Mother had not "completed the required plans to regain custody" of the Child, (2) Mother's "communication with DCS was troublesome throughout this case," (3) Mother was incarcerated at the time of trial, (4) Mother had not "demonstrated continuity and stability in meeting the child's basic needs," and (5) Mother had not "shown the ability to take care of [her] own needs, better yet the child's needs." As with factor one, the court thus found that Mother had not effected a lasting adjustment in her circumstances, conduct, or conditions.

Within its best interest analysis, the trial court did not make an express finding concerning whether DCS had made reasonable efforts to assist Mother in effecting a change in her circumstances, which is part of factor (2) under the applicable version of the statute and is factor (L) under the amended version. However, throughout the case, the trial court did find that DCS had made reasonable efforts, and within its findings regarding abandonment through failure to establish a suitable home, the court expressly found that DCS had made reasonable efforts to assist Mother during the applicable time period. The trial court also stated in its final order that "DCS [had] attempted to work with Mother and Father while the child has been in custody, but DCS was unsuccessful in getting either parent to complete their permanency plans." Along these lines, the court

found, as noted above, that Mother's communication with DCS had been "troublesome," indicating that the lack of communication rendered it difficult for DCS to assist Mother prior to her February 2020 incarceration.

Within her argument regarding the statutory ground of abandonment through failure to establish a suitable home, Mother disputes the trial court's finding of reasonable efforts as to that ground, but Mother does not address DCS's efforts within her argument concerning the best interest analysis. We have previously determined that Mother's argument within the statutory ground was unavailing. We also emphasize that DCS's efforts "shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Therefore, we determine that the evidence preponderates in favor of a finding that factor two—whether Mother failed to effect a lasting adjustment after reasonable efforts by DCS—weighs in favor of terminating Mother's parental rights to the Child.

Furthermore, although the trial court did not directly refer to factors three and seven, we determine that the court did make findings regarding factor three, whether Mother had maintained regular visitation with the Child, and factor seven, whether the physical environment of Mother's home would be healthy, safe, and free from criminal activity or abuse of controlled substances. Throughout its best interest analysis, the court found that Mother had not visited the Child since December of 2018. The court also found that Mother was incarcerated and that she had not demonstrated that she could remain free from substance abuse when not incarcerated. Certainly, while incarcerated, Mother did not have a safe physical environment for the Child. Moreover, Mother's criminal convictions, including those resulting from the incident that led to the Child's removal from her custody and those resulting from the June 2020 vehicular homicide, demonstrated that Mother had repeatedly been involved in criminal behavior related to substance abuse. We conclude that factors three and seven also weigh in favor of terminating Mother's parental rights.

Other than an oblique statement that Mother had not "shown the ability to take care of [her] own needs, better yet the child's needs," the trial court did not make any findings as to factor eight, whether Mother's mental or emotional status would be detrimental to the Child or prevent Mother from effectively providing safe and stable care and supervision. Mother testified that she had completed a mental health assessment at some point early in the pendency of this case, and she also testified that she regularly took her medications related to mental health. Ms. Pelicci testified that DCS had no documentation of Mother's mental health assessment. Mother's repeated struggles with substance abuse may well indicate a mental and/or emotional status that would be detrimental to the Child or prevent Mother from effectively providing care. However, beyond Mother's substance abuse, DCS did not present evidence involving Mother's

mental or emotional status. Acknowledging that the trial court may have found factor eight inapplicable, we conclude that factor eight weighs neither for nor against terminating Mother's parental rights.

Finally, although the trial court made no finding in its best interest analysis regarding factor nine, whether Mother had paid child support, the court did find clear and convincing evidence of the statutory ground of abandonment by failure to pay child support. We have affirmed this ground and therefore determine that factor nine also supports termination of Mother's parental rights.

Based on our exhaustive review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's determination as to the statutory ground of abandonment through failure to visit the Child and, to the extent that the trial court determined that Mother exhibited wanton disregard for the Child prior to Mother's incarceration, we reverse that determination for insufficient findings of fact and conclusions of law. We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Brittnie W.


s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II., JUDGE